IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STACEY JO KINLEY,                                    Case No. 3:14-cv-00693-SB

             Plaintiff,                              **OPINION AND ORDER**

      v.

DR. ROBERT SNIDER, MARY RAINES,
JOHN AND JANE DOES 1-10,

             Defendants.

---

**BECKERMAN, Magistrate Judge.**

      Stacey Jo Kinley ("Kinley") filed a Complaint against Dr. Robert Snider, Mary Raines,

and John/Jane Does 1-10 (collectively "Defendants"), alleging a claim under 42 U.S.C. § 1983

for a violation of Kinley's Eighth Amendment right to be free of cruel and unusual punishment

arising from Defendants' alleged failure to provide adequate medical care. (ECF No. 1.)

Defendants filed a Motion for Summary Judgment (ECF No. 44), seeking entry of judgment on

Kinley's § 1983 claim. For the reasons set forth below, the Court GRANTS Defendants' Motion

for Summary Judgment and dismisses Kinley's Complaint.

## BACKGROUND

Kinley was in the custody of the Oregon Department of Corrections ("ODOC") from June 23, 2010 until her release on July 21, 2016. (Robert W. Snider Decl. Attach. 1, Aug. 26, 2015.) At the time ODOC took custody of Kinley, she was suffering from pre-existing spinal injuries. In 1994 and 1998, Kinley underwent fusion surgeries following a car accident and a domestic violence incident, respectively. (Michelle Burrows Decl. Ex. 43 at 4, Jan. 30, 2017.) While Kinley reported good results following the 1994 back surgery, in 2008 she became "progressively worse." (Burrows Decl. Ex. 43 at 4 ("For the past one year, the pain has become more intolerable.").)

In July 2010, when Kinley entered the Coffee Creek Correctional Facility ("CCCF"), Dr. Snider performed an intake examination and medical screening of Kinley. (Snider Decl. ¶ 6.) During her intake exam, Kinley reported "chronic neck pain and a history of fusion surgeries of the cervical spine at C3-6 in 1994 and 1999 due to a ruptured disk as a result of a motor vehicle accident; a left ankle open reduction and internal fixation with steel plate . . . in 2001; and right shoulder and back tumor surgical repair, date unknown." (Snider Decl. ¶ 6.) Dr. Snider was aware of Kinley's pre-existing spinal injuries. (Burrows Decl. Ex. 39 (Robert W. Snider Dep. 48:2-49:24 (acknowledging that he reviewed Kinley's medical records), July 22, 2015 (hereinafter "Snider Dep.").)

In accordance with the practice at CCCF, Kinley was assigned to work in the kitchen for six months upon her arrival at the prison. (Burrows Decl. Ex. 41 (Stacey Jo Kinley Dep. 47:7-10 ("[A]nybody that gets here from a new – or just coming into the facility, is required to work in the kitchen for six months before you can look for another job."), July 22, 2015 (hereinafter "Kinley Dep.").) In response to her complaints about neck pain while performing her kitchen

duties, Dr. Snider placed Kinley on a lifting restriction of no more than twenty pounds for four months, beginning August 3, 2010. (Snider Decl. ¶ 11.) However, Dr. Snider declined, as unnecessary, Kinley's request for a shorter work shift. (Snider Decl. ¶ 11.)

On August 23, 2010, Kinley fell in the kitchen during her work shift. (Snider Decl. ¶ 12; Kinley Dep. 50:8-51:8.) Immediately after her fall, Kinley told her supervisor that she was "not okay and I need to go to medical." (Kinley Dep. 54:4-12.) Kinley reported to the nursing staff at CCCF that she fell in the kitchen and hurt her back. (Snider Decl. ¶ 12.) Medical staff placed Kinley "on a no work status until Thursday, August 26, 2010, when she could be seen by a provider." (Snider Decl. ¶ 12.) On August 26, 2010, at Kinley's request, the no work order and the lifting restrictions were discontinued. (Snider Decl. ¶ 13, Attach. 2 at 115.) However, on the same day, Dr. Kinley extended Kinley's Neurontin prescription and authorized an additional pillow and towel for six months. (Snider Decl. Attach. 2 at 115.)

In May 2011, Kinley complained of pain radiating through her right side and numbness in her right arm. (Kinley Dep. 56:11-19.) Kinley alleges that despite multiple earlier complaints of pain and discomfort, it was not until she presented with pain and numbness on her right side, *i.e.*, a "new injury," that ODOC ordered an x-ray. (Kinley Dep. 58:10-59:12.) With regard to her prior complaints of pain, on July 29, 2010, Kinley had reported to medical staff that she "worked in the kitchen yesterday when I got done my neck hurt so bad I couldn't stand it. I've had # surgeries on my neck. I've been disabled x 10 years you should have all that. I shouldn't be working anyway." (Burrows Decl. Ex. 12.) The Progress Notes from that visit include the entry: "Provider APPT MADE." (Burrows Decl. Ex. 12.) The medical records between August 2010 and May 2011 include a number of entries regarding Kinley seeking treatment for pain. (Burrows Decl. Ex. 13 (in August 2010, Kinley complains of a "sore right shoulder"); Ex. 14 (in

August 2010, Kinley seeks treatment for "chronic neck pain"); Ex. 15 (in September 2010,

Kinley reports that her "butt cheek hurts down to calf"); Ex. 16 (in August 2010, Kinley

complains of "frequent numbness" in her right hand and "sometimes" numbness in her right

shoulder); Ex. 17 (in September 2010, Kinley seeks treatment for chronic muscle tightness and

pain); Ex. 18 (in October 2010, Kinley states that she "fell in kitchen my hips getting worse &

worse. They have to do something. I guess I'm just going to have to contact my lawyer."); Ex. 19

(in November 2010, Kinley requests chiropractic treatment); Ex. 21 (in April 2011, Kinley seeks

treatment for "chronic neck & back pain"); Ex. 22 (in May 2011, Kinley reports that she has

"been losing strength in my hands. Sometimes I have numbness from my neck down my hand.

There's no pain.").)

On May 23, 2011, Kinley underwent a cervical spine x-ray that showed evidence of

degenerative disc disease:

> [Q]uite severe degenerative disc disease involving intervertebral
> disc spaces from C3 to C6. The bodies of C5-6 and 7 have been
> surgically fused. IMPRESSION: Anterior subluxation of C3 is
> most likely due to degenerative changes involving posterior facet
> joints. There is degenerative disc disease from C3 to C5. There has
> been a surgical fusion from C5 to C7.

(Snider Decl. Attach. 2 at 163.) The following month, in June 2011, Dr. Snider referred Kinley to

ODOC's orthopedic surgeon, Dr. Jerry Becker, for an evaluation of Kinley's neck pain.

(Burrows Decl. Ex. 27.)

Dr. Becker evaluated Kinley for her cervical spine complaints. In addition to performing

a clinical examination, Dr. Becker reviewed Kinley's x-ray. Dr. Becker diagnosed Kinley with

"C5-6, C6-7 fusion with multi-level degenerative disc disease and some subluxation of C3-4."

(Defs. Mot. Summ. J. Ex. 3 (Jerry Becker Dep. 25:13-15, Jan. 21, 2016 (hereinafter "Becker

Dep.").) Additionally, Dr. Becker provided a "second diagnosis" to "rule out C7-T1 nerve root

compromise on the right side." (Becker Dep. 25:16-17.) Dr. Becker recommended that Kinley undergo a cervical magnetic resonance imaging ("MRI"), "fairly soon." (Becker Dep. 26:6-7.)

On August 2, 2011, Kinley received an MRI. (Snider Decl. Attach. 2 at 165.) Dr. Becker reviewed the MRI report and concluded that "the findings are long-term, multi-year, they are basically a combination of trauma and degenerative disc disease, aging issues." (Becker Dep. 31:5-8.) Dr. Becker noted that Kinley had not experienced a "fracture or dislocation" and the "spurs" were a result of long-term formation, not a recent trauma. (Becker Dep. 31:10-15.) It was Dr. Becker's opinion that from an "orthopedic surgeon's standpoint there was "no indication . . . for surgery." (Becker Dep. 44:4-7.)

The following month, a neurosurgeon, Dr. Magdalene Banasiak, evaluated Kinley for cervical spine surgery. (Burrows Decl. Exs. 31, 32.) Dr. Banasiak examined Kinley and reviewed the same x-ray and MRI that Dr. Becker considered. Dr. Banasiak recommended Kinley have an "EMG and nerve conduction study of the right upper extremity to rule out ulnar neuropathy." (Burrows Decl. Ex. 32 at 2.) Contrary to Dr. Becker's view, Dr. Banasiak recommended that Kinley "undergo anterior cervical discectomy and fusion at C4-5 and C3-4 for decompression of the spinal canal, bilateral nerve roots causing radiculopathy, and correction of the progressive kyphosis." (Burrows Decl. Ex. 32 at 2.) On April 10, 2012, Dr. Brian Ragel performed the surgery recommended by Dr. Banasiak.[1]

## STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On a motion

---

[1] Kinley's counsel states, without a record citation, that "Dr. Ragel reports . . . Kinley reported to him significant relief in her arm pain and a reduction in right arm numbness . . . . Kinley reports little pain and is much more comfortable. Her pain is well managed now." (Pl.'s Resp. 27.)

for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

## I.   PLRA EXHAUSTION

### A.   The PLRA's Exhaustion Requirement

Defendants argue that the Court need not reach the merits of this case because Kinley failed to exhaust her administrative remedies for denial of adequate medical treatment prior to filing this action. (Defs.' Mot. Summ. J. 7.) As support for their argument, Defendants rely on the Declaration of Lisa Arrington ("Arrington"), CCCF's Diversity Coordinator and an ODOC custodian of records. According to Arrington, Kinley could have sought administrative review of her medical treatment issues through established grievance procedures.[2] (Lisa Arrington Decl. ¶ 5, Aug. 3, 2015.) In response, Kinley argues that she "exhausted all available remedies prior to filing this lawsuit." (Pl.'s Resp. 35.)

The Prison Litigation Reform Act ("PLRA") amended 42 U.S.C. § 1997e to provide that: "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Under the

---

[2] Kinley is familiar with prison grievance procedures, having filed sixteen grievances between July 20, 2010 and December 11, 2013, some of which she appealed. (Arrington Decl. Attach. 6.)

PLRA, incarcerated plaintiffs are required to exhaust all available administrative remedies within the institutions in which they are housed before bringing any federal action in connection with prison conditions, including actions under 42 U.S.C. § 1983. *Goninan v. C/O Smith, Corp.,* No. 6:12-cv-02310-PK, 2015 WL 853044, at *5 (D. Or. Feb. 25, 2015). For purposes of the PLRA, actions brought with respect to "prison conditions" include all actions challenging isolated episodes of unconstitutional or otherwise unlawful misconduct of any kind, as well as prisoner petitions challenging conditions of confinement. *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

Exhaustion of all available remedies is mandatory, and those remedies need not meet federal standards, nor must they be "plain, speedy, and effective." *Id.* at 524. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* 548 U.S. 81, 90-91 (2006). The PLRA's exhaustion requirement cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 84. "Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter,* 534 U.S. at 524; *see also Booth v. Churner,* 532 U.S. 731, 739 (2001) (holding that an inmate "seeking only money damages must complete a prison administrative process that could provide some sort of relief on the complaint stated, but no money").

Once a defendant demonstrates that there was an available administrative remedy and the inmate did not exhaust that available remedy, the inmate has the burden of production to come forward with evidence demonstrating there is something in her case that made the existing and generally available administrative remedies effectively unavailable to her. *Albino v. Lee BACA, Los Angeles Cty. Sheriff,* 747 F.3d 1162, 1172 (9th Cir. 2013) (en banc). The proper procedure

for seeking dismissal of an inmate's claims for failure to exhaust is a motion for summary judgment. *Id.* at 1169-71.

Defendants provided the Court with a summary of ODOC's grievance procedures. For CCCF inmates such as Kinley, grievances are processed in accordance with the ODOC Administrative Rules governing *Grievance Review System (Inmate),* set forth in Chapter 291, Division 109 of the Oregon Administrative Rules ("OAR"). (Arrington Decl. ¶ 6, Attachs. 2, 3, 4.)[3] ODOC has a three-level grievance and appeal remedy process in place to address inmate complaints. (Arrington Decl. ¶¶ 6-10.) Inmates are informed of the processes for filing a grievance during admission and orientation to the facility where they are housed. (Arrington Decl. ¶ 7.) The grievance process is also explained in the inmate handbook, which is provided to each inmate. (Arrington Decl. ¶ 7.) Additionally, inmates may ask any housing unit officer for a grievance form, which is accompanied by an instruction sheet. (Arrington Decl. ¶ 7.)

Inmates may file grievances regarding several issues, including "unprofessional behavior or action which may be directed toward an inmate by an employee or volunteer." OAR 291-109-0140(2)(c). Inmates are encouraged to communicate grievances informally with first-line staff as their primary means of resolving disputes, before filing a formal grievance. OAR 291-109-0140(1)(a). If the initial communication does not resolve the grievance, the inmate may proceed to level one by completing a grievance form. *Id*. If the matter is not an emergency, grievance forms must be filed with the grievance coordinator within thirty days of the aggrieving incident, and contain "a complete description of the incident, action, or application of the rule being grieved, including date and approximate time." *Id*. at 291-109-0140(1)(b) and 291-109-0150(2).

---

[3] Since Kinley's admission to CCCF on June 23, 2010, ODOC twice amended these rules. (Arrington Decl. ¶ 6, Attachs. 2, 3, 4.)

An inmate cannot grieve misconduct reports or issues for which the inmate has filed suit in state or federal court. *Id*. at 291-109-0140(3)(g), (h).

At level two, an inmate may appeal the grievance coordinator's decision regarding the inmate's level-one grievance form to the functional unit manager. *Id*. at 291-109-0170(1). The inmate must file a grievance appeal form with the grievance coordinator within fourteen days of the date ODOC sent the level-one grievance response to the inmate. *Id*. at 291-109-0170(1)(b). At level three, the inmate may appeal the decision made by the functional unit manager by filing an additional grievance appeal form with the grievance coordinator within fourteen days of the date ODOC sent the level-two grievance response to the inmate. *Id*. at 291-109-0170(2). This level three appeal satisfies the administrative remedies exhaustion requirement under 42 U.S.C. § 1997e(a).

Inmates are required to exhaust all available grievance remedies before filing a § 1983 action, including appealing the grievance decision to the highest level within the grievance system, or suffer dismissal of their complaint. *McKinney v. Carey,* 311 F.3d 1198, 1201 (9th Cir. 2002) ("Requiring dismissal . . . when there is no presuit exhaustion provides a strong incentive that will further these Congressional objectives; permitting exhaustion *pendente lite* will inevitably undermine attainment of them.")

The Court now turns to the grievances Kinley filed that arguably relate to her § 1983 allegations against Defendants, to determine whether she exhausted ODOC's administrative remedies or, alternatively, was excused from doing so.

## B. Kinley's Grievances

Kinley alleges that Defendants failed to provide adequate medical care for both her existing chronic neck and back pain and after she fell in the CCCF kitchen on August 23, 2010. (Compl. ¶ 1.) Additionally, Kinley alleges that Defendants failed to give her a sedentary work

assignment, failed timely to schedule her neck surgery in December 2011, and failed to provide her with physical therapy to improve her range of motion. (Compl. ¶ 35.) Defendants assert that Kinley filed five "grievances that appear arguably related to her medical care during the relevant timeframe." (Defs. Mot. Summ. J. 7-10.)

Kinley responds that she filed only three grievances "pertinent to this inquiry," on September 21, 22, and 28, 2010. (Pl.'s Resp. 28.) Defendants also identified the September 21 and 22, 2010 grievances, and the parties agree that the September 28, 2010, grievance was denied as duplicative of an earlier grievance. Kinley also asserts that she attempted to file a grievance in June 2012, but that ODOC returned the grievance in light of Kinley's pending state litigation. (Burrows Decl. Exs. 7, 8.) In an abundance of caution, the Court will consider all of the six grievances identified by the parties as potentially relevant to Kinley's claims.

### 1. Grievance # CCCF -2010-09-069

Kinley filed Grievance # CCCF-2010-09-069, dated September 21, 2010, seeking an exemption from her kitchen assignment due to a medical disability lasting for approximately ten years. (Arrington Decl. Attach. 10 at 2.) On October 11, 2010, Della Murray ("Murray") filed a Grievance Response Form denying Kinley's request for a work restriction excusing her from kitchen duty. (Arrington Decl. Attach. 10 at 3 ("You have no physical findings for any work restrictions.").) Kinley did not appeal this decision denying her request for a work restriction. (Arrington Decl. ¶ 16.)

### 2. Grievance # CCCF -2010-09-071

Kinley filed Grievance # CCCF-2010-09-071, dated September 22, 2010, seeking "medical attention" for "excruciating pain" that resulted from her August 2010 fall in the kitchen. (Arrington Decl. Attach. 11 at 2.) On October 8, 2010, Dr. Snider filed a Grievance Response Form denying Kinley's request for additional medical intervention for her pain.

PAGE 10 – OPINION AND ORDER

(Arrington Decl. Attach. 11 at 3 ("Unfortunately, I can do nothing regarding the scheduling process at CCCF.").) In denying Kinley's request, Dr. Snider noted that Kinley had "complaints of back, shoulder and/or neck pain for approximately 20 years or more." (Arrington Decl. Attach. 11 at 3.) Dr. Snider acknowledged that "years of chronic pain are usually difficult to treat to a pain-free level" and the goal instead is to "increase a person's functional level as well as decrease pain when possible . . . ." (Arrington Decl. Attach 11 at 3.) Kinley did not appeal this decision denying her request for additional medical attention. (Arrington Decl. ¶ 17.)

### 3.   Grievance # CCCF-2012-06-022

Kinley filed Grievance # CCCF-2012-06-022 on June 18, 2012, "grieving the conditions in the med[ium] security kitchen" and seeking "footwear that will grip the floor better . . . rubber mats . . . [and] resurface kitchen floor." (Arrington Decl. Attach. 15 at 2.) On June 26, 2012, C. Casper, CCCF Diversity Coordinator, notified Kinley by letter that CCCF was returning Grievance # CCCF-2012-06-022 because on February 17, 2012, Kinley filed a complaint in Washington County Circuit Court pursuing her claims in Grievance # CCCF-2012-06-022. (Arrington Decl. Attach. 15 at 3 ("The grievance is now closed.").)

### 4.   Grievance # CCCF -2012-12-003

Kinley filed Grievance # CCCF-2012-12-003 on December 11, 2012, seeking "a follow-up appt. with Dr. Becker and an MRI of my lumbar spine to diagnose my lower back injury." (Arrington Decl. Attach. 18 at 2.) On January 4, 2013, Murray filed a Grievance Response Form denying Kinley's request for an appointment with Dr. Becker. (Arrington Decl. Attach. 18 at 3 ("The appointment with Dr. Becker was for your left knee but was cancelled after seeing Dr. Paulson on 11/8/12 and your knee had improved. You were never scheduled to see Dr. Becker for any back problems.") Kinley filed a Grievance Appeal Form on January 16, 2013, renewing her request for an appointment with Dr. Becker. (Arrington Decl. Attach. 18 at 4 ("I want to see

Dr. Becker – the visiting orthopedic surgeon – for an assessment of my back injury and possible MRI.").) On February 5, 2013, Dr. S. Shelton ("Dr. Shelton"), the ODOC Medical Director, denied Kinley's request for an appointment with Dr. Becker. (Arrington Decl. Attach. 18 at 6 ("You have been evaluated for your back injury. Given the current findings, your condition does not indicate an appointment with a specialist nor is a MRI recommended at this time.").) Kinley did not appeal this second denial of her request for an appointment with Dr. Becker and an MRI. (Arrington Decl. ¶ 26.)

### 5. Grievance # CCCF -2013-12-002

Kinley filed Grievance # CCCF-2013-12-002 on December 6, 2013, seeking "something to alleviate my pain – I request [g]abapentin renewed." (Arrington Decl. Attach. 20 at 2.) On December 11, 2013, Murray filed a Grievance Response Form denying Kinley's request for gabapentin. (Arrington Decl. Attach. 20 at 4 ("Due to the misuse by you of gabapentin the provider has declined to continue you on this medication. The provider has ordered another medication to control your pain.") Kinley filed a Grievance Appeal Form on December 24, 2013, renewing her request for "gabapentin crushed." (Arrington Decl. Attach. 20 at 5.) On January 3, 2014, Dr. Shelton denied Kinley's request for gabapentin, noting that Kinley's "provider is not required to renew a medication you admitted to improperly taking on November 25, 2013." (Arrington Decl. Attach. 20 at 6 ("Your case was brought to the Therapeutic Level of Care (TLC) committee and the medication Indomethacin was approved to be renewed.").) Kinley did not appeal this second denial of her request for gabapentin. (Arrington Decl. ¶ 28.)

### 6. Grievance # CCCF -2014-06-022

Kinley filed Grievance # CCCF-2014-06-022 on January 18, 2014, requesting "an ultrasound . . . of my right knee to determine what is wrong with it." (Arrington Decl. Attach. 22 at 2.) On October 8, 2010, Dustin Gordon filed a Grievance Response Form stating "I have

PAGE 12 – OPINION AND ORDER

scheduled a chart review with your provider to decide on a plan of care for you in regards to your right knee pain." (Arrington Decl. Attach. 22 at 3.) Kinley did not appeal this response. (Arrington Decl. ¶ 31.)

### C.    Exhaustion Analysis

To prove an inmate failed to exhaust her administrative remedies under the PLRA, a defendant must demonstrate that there was an "available administrative remedy" that the inmate did not exhaust. *Williams v. Paramo,* 775 F.3d 1182, 1191 (9th Cir. 2015). Defendants satisfy this burden with the Arrington Declaration describing the three-step ODOC grievance process and the grievances Kinley filed relating to her claims in this case. For five of the six grievances discussed above, it is undisputed that an administrative remedy was available but that Kinley failed to exhaust the appeals process.

With regard to Kinley's sixth grievance, Grievance # CCCF-2012-06-022, relating to her request for better footwear or rubber mats while working in the kitchen, ODOC returned that grievance in accordance with the requirement set forth in OAR 291-109-0160(4) that ODOC must return the grievance to the inmate if she has pursued the issue through a lawsuit: "If at anytime the grievance coordinator determines the inmate has pursued his/her issue through state or federal courts . . . the grievance process will cease and the grievance will be returned to the inmate." Kinley argues that there was no available administrative remedy for that grievance because ODOC returned the grievance. As an initial matter, Kinley's grievance requesting better footwear or a rubber mat while working in the kitchen are not issues she has raised in this case, and therefore her inability to exhaust the June 2012 grievance is not relevant to this analysis. In any event, the PLRA requires that Kinley "complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford*, 548 U.S. at 88. Kinley's decision to file a state court

PAGE 13 – OPINION AND ORDER

lawsuit in lieu of pursuing further administrative remedies was a strategic choice that does not deem those administrative remedies otherwise unavailable. Defendants have met their burden to demonstrate that administrative remedies were available to Kinley. *See Williams,* 775 F.3d at 1192 (explaining that demonstration of a system of available administrative remedies satisfies the initial step of the *Albino* burden-shifting inquiry).

Once Defendants demonstrate the existence of an unexhausted, available administrative remedy, the burden shifts to Kinley, who must demonstrate that the relevant remedy was "ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Id*. at 1191 (quotations and citation omitted). Kinley initially asserts that she "exhausted the available remedies for the issues raised in this litigation" (Pl.'s Resp. 28), which is not accurate, as set forth above.[4] Kinley argues alternatively that "she was denied access to the grievance process." (*Id.*)

Kinley's argument that she was denied access to the grievance process is based on ODOC's return of her June 2012 grievance requesting better footwear or floor mats in the kitchen. She alleges that she interpreted ODOC's return of her grievance to mean that she was "barred from accessing the grievance procedures and that any further attempt to do so would be wholly futile." (Pl.'s Resp. 34.) Kinley's argument fails for at least three reasons.

First, Kinley may not avoid the PLRA's exhaustion requirement by prematurely filing a lawsuit. *See, e.g.*, *Vaden v. Summerhill,* 449 F.3d 1047, 1048 (9th Cir. 2006) ("PLRA requires that a prisoner exhaust administrative remedies before submitting any papers to the federal court"); *Brown v. Valoff,* 422 F.3d 926, 929-30 (9th Cir. 2005) (holding that "a prisoner may not

---

[4] Kinley also alleged in her Complaint that she "fully exhausted all available administrative remedies through three levels of appeals." (Compl. ¶ 35.) However, the record is undisputed that Kinley did not exhaust any of her grievances through three levels of appeals.

proceed to federal court while exhausting administrative remedies"); *McKinney*, 311 F.3d at

1199 (the PLRA "contemplates exhaustion *prior* to the commencement of the action as an

indispensable requirement"); *Vega v. Bell*, No. 2:13-cv-00931-HU, 2015 WL 413796, at *5 (D.

Or. Jan. 29, 2015) ("Because [the inmate] did not comply with a critical procedural rule –

completing the grievance procedure *before* filing a tort claim notice – he failed to properly

exhaust his administrative remedies under § 1997e(a)."); *see also Ippolito v. DeCamp*, No. 3:11-

cv-676-PK, 2013 WL 1636078, at *5 (D. Or. Mar 25, 2013) (even assuming inmate filed a tort

claim notice, court found "no statutory or case-law support for the proposition that avoiding

grievance procedures by filing a notice of tort claim can under any circumstances constitute

exhaustion of available administrative remedies"). To hold otherwise would allow any inmate to

avoid the PLRA's exhaustion requirement by filing a case in state court, dismissing the case, and

refiling in federal court while alleging that administrative remedies were unavailable.

Second, the grievance ODOC returned to Kinley related to her request for better footwear

and rubber mats, issues not raised in this case. She has not presented any evidence of a grievance

related to her claims in this case that ODOC failed to process. On the contrary, the record reflects

that ODOC processed her grievances relating to medical care both before and after she filed (and

later dismissed) her state lawsuit. The grievances she filed in late 2012 and in 2013 and 2014

contradict her current allegation that she believed any grievances filed after her state court

lawsuit would be futile.

Third, this action relates only to events "beginning [o]n June 23, 2010 and continuing to

May 2012" (Compl. ¶ 1), and therefore the availability of administrative remedies for events

post-dating May 2012 is not relevant to Kinley's ability to exhaust. The deadline for Kinley to

appeal the two 2010 grievances she identifies as "pertinent" had long since expired before she

filed her state lawsuit and before ODOC returned her June 2012 grievance. Specifically, ODOC

denied Kinley's Grievance # CCCF-2010-09-069 on October 11, 2010, and Kinley only had

fourteen days to appeal that denial. OAR 291-109-0170(1)(b) ("The grievance coordinator must

receive an appeal within 14 calendar days from the date the grievance response was sent to the

inmate . . . ."). Similarly, ODOC denied Kinley's Grievance # CCCF-2010-09-71 on October 8,

2010, and she did not appeal that denial within the required fourteen days. Therefore, her alleged

belief that filing any further grievances would have been futile after ODOC returned the June

2012 grievance is irrelevant, because any medical care she would have grieved after June 2012

post-dates the medical care she challenges in this case. Kinley's argument that administrative

remedies relating to her current claims were not available to her is squarely contradicted by the

record.

        Even viewing the facts in a light most favorable to Kinley, the Court concludes that

Kinley did not properly exhaust her administrative remedies before filing her Complaint in

federal court. By failing to pursue each of her grievances through the final level of appeal,

Kinley did not comply with the requirements of ODOC's grievance process. *See Woodford*, 548

U.S. at 90 ("Proper exhaustion demands compliance with an agency's deadlines and other

critical procedural rules[.]"); *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (holding that

the exhaustion requirement is not satisfied if an inmate fails to "use all steps the prison holds out,

enabling the prison to reach the merits of the issue"). Additionally, Kinley has not presented any

evidence to excuse her failure to exhaust. Specifically, Kinley has not demonstrated that the

administrative remedies were "effectively unavailable." *Cf. Sapp v. Kimbrell*, 623 F.3d 813, 823

(9th Cir. 2010) (holding that "improper screening of an inmate's administrative grievances

renders administrative remedies 'effectively unavailable' such that exhaustion is not required

under the PLRA"); *see also Vega*, 2015 WL 413796, at *4 n.5 ("The gravamen of [cases relied

upon by the court in *Sapp*] is that institutional mistake or affirmative misconduct will excuse

proper exhaustion – not that exhaustion has been achieved simply because an inmate is told no

more process is available."). For these reasons, the Court grants Defendants' motion for

summary judgment based on Kinley's failure to exhaust available administrative remedies.

## CONCLUSION

Based on the foregoing, the Court GRANTS Defendants' Motion for Summary Judgment

(ECF No. 44), and DISMISSES Kinley's Complaint (ECF No. 1) with prejudice.[5]

IT IS SO ORDERED.

DATED this 13th day of July, 2017.

STACIE F. BECKERMAN
United States Magistrate Judge

---

[5] Although a plaintiff's failure to exhaust administrative remedies usually results in a dismissal without prejudice, the deadlines to exhaust Kinley's administrative remedies have long since passed and she has been released from custody, and therefore she is unable to cure her failure to exhaust.